UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
ASHLAND

CIVIL ACTION NO. 0:05-cv-73-HRW

ROTONDO WEIRICH ENTERPRISES, INC.,                    PLAINTIFF,

V.

ROCK CITY MECHANICAL, INC.,                           DEFENDANT.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [Docket No. 21]. The matter has been fully briefed by the parties and now stands ripe for decision. The Court has considered the arguments of the parties and reviewed the record. The Court, being otherwise sufficiently advised will sustain Defendant's Motion.

## I. BACKGROUND

This case arises out of the construction of the Elliot County Medium Security Correctional Facility in Elliot County, Kentucky ("the Elliot County Project"). Ray Bell Construction Company, Inc. ("RBCC"), not a party to this action, was the general contractor for construction of the facility.
 In preparation of its bid for the project, Ray Bell solicited prices from several prospective subcontractors. RBCC had solicited prices from the Plaintiff, Rotondo Weirich Enterprises ("RWE"), for construction and installation of pre-cast concrete

prison cells and from Defendant, Rock City Mechanical, Inc., ("Rock City") for HVAC and plumbing for outside the cell chases ("the outside work"). Prior to bid day, RBCC had also requested that Rock City provide a separate price proposal to RWE directly for the design, supply, and installation of HVAC and plumbing inside the precast cell chases ("the inside work"). RBCC ultimately awarded a contract to RWE to supply the cells and to Rock city to perform the outside work. The acceptance of those bids and subsequent awards were memorialized by writings.

Rock City never performed the inside work. RWE filed suit in this court seeking damages under theories of breach of contract and promissory estoppel. Rock City has moved for summary judgment on both claims. Rock City argues that its bid proposal to RWE was never accepted and thus a contract was never formed. RWE disputes this characterization and points to several instances of what it calls "acceptance" of Rock City's bid proposal. A brief timeline of events is necessary to understanding the parties' positions.

On August 2001, Walter Bannon, an employee of RWE faxed to Rock City a request for pricing. Mr. Bannon was the "preconstruction director and estimator," and the one responsible for obtaining pre-contract pricing. Bannon and Caleb Moyer were the two RWE Employees responsible for subcontract pricing and

2

obtaining subcontracts. On August 21, 2001, Rock City responded to the request with its offer to design and install the outside work at a price of $156,000. The proposals were prepared by Larry Medlen, Vice President for Rock City, and Sam Mullins, Project Manager for the Elliot County project. Medlen and Mullins were the only two home office employees involved directly in the Elliot County Project.

On October 23, 2001, RBCC notified Rock City that it had been awarded a subcontract to supply HVAC and plumbing work outside the cell chases (the outside work). On this date, RBCC also notified RWE that it had been awarded a subcontract to supply the precast cells, including the HVAC and plumbing work inside the cell chases for which RWE had requested a bid from Rock City. Both such notifications were in the form of a writing.

In early December 2001, during a preconstruction meeting at which representatives of all parties were present, RWE alleges that John Malonski, the Preconstruction Director for RWE at the time, said to Medlen and Mullins, "it appears you guys will be doing to work for us," (referring to the inside HVAC and plumbing work). Neither Medlen nor Mullins have any memory of such conversation ever taking place.

In February 2002, RWE's Walter Bannon began preparing designs of the HVAC and plumbing work for inside the cell chases. These designs would have

3

been the responsibility of the subcontractor performing the inside work. Bannon has no recollection of having ever communicated with anyone from Rock City regarding the preparation of the HVAC and plumbing design drawings.

In March 2002, RBCC sent an email to Caleb Moyer requesting RWE's shop drawings. Moyer was the Project Manager of the Elliot County Project and the RWE employee responsible for administering subcontracts. On March 24, 2002, RBCC acknowledged receipt of the drawings from RWE and stated that a copy would be provided to Rock City, RBCC's plumbing and mechanical subcontractor.

On April 16, 2002, Rock City requested from RBCC information concerning RWE's chase design. Rock City needed this information to coordinate the cell chase HVAC and plumbing being performed by RWE with the "underground rough in" being performed by Rock City. The cell chase HVAC and plumbing information requested would have been the responsibility of the subcontractor performing the inside work. Rock City states that it requested this information from RBCC because Rock City did not have a direct contractual relationship with RWE. On April 24, 2002, Rock City again requested the information from RBCC, notifying it that a lack of the cell chase HVAC and plumbing design threatened to delay construction on the project. Rock City again requested this information from

4

RBCC on April 29, 2002. On April 30, 2002, Caleb Moyer faxed six pages of design drawings to RBCC.

In May 2002, RWE hired a mechanical contractor out of Pennsylvania to install cell chase HVAC and plumbing per RWE's design in a plywood "mock-up" cell chase constructed on site by RBCC. This mock up was necessary to get approval of the design from the state of Kentucky. Per the affidavit of John Binder, formerly Director of Operations for RWE, he claims to have sent the materials for a mock up directly to Rock City in attempt to get them to submit the design. Binder states that Rock City refused and returned the mock up materials. Rock City's affidavits claim that no such mock up was ever requested and that no materials were ever received in the mail.

On May 20 and again on May 23, 2002, RBCC put RWE on 48 hour notice to provide submissions of proposed materials to be used in the cell chases. This would have been the responsibility of the subcontractor performing the inside work. On May 29, 2002, RWE transmitted detailed design drawings to RBCC. These design drawings were prepared by Walter Bannon at RWE. The drawings were significantly different from the designs on which Rock City's original August 2001 bid had been based.

On June 25, 2002, RWE sent the design drawings to Rock City. On July 1,

5

2002, Rock City sent RWE a second price proposal of $395,000 to supply and install HVAC and plumbing inside work in accordance with RWE's design. On July 5, 2002, Caleb Moyer, was instructed to send Rock City a proposed subcontract agreement based on the August 21, 2001 original bid of $165,000. Rock City states that it has no record of having received such a proposed subcontract either on July 5 or at any other time. Rock City additionally states that even had it received such a subcontract it would not have accepted such an offer as the price had been based upon Rock City's own design.

Plaintiff has produced no writing to prove its acceptance of Rock City's original offer or any writing tending to prove the existence of any sort of contractual relationship.

## II. THE SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure the Court must view the evidence in the light most favorable to the nonmoving party, in this case, the Plaintiffs. Thus, when examining the record the Court will resolve doubts and construe inferences in favor of the Plaintiffs in an effort to determine if any genuine issues of material fact exist. However, in a series of decisions commonly referred to as the "trilogy", *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Anderson*

*v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986), the U.S. Supreme Court emphasized that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. In short, the "trilogy" requires the nonmoving party to produce specific factual evidence that a genuine issue of material fact exists.

The United States Court of Appeals for the Sixth Circuit has interpreted the "trilogy" to mean that the nonmoving party must produce enough evidence, after having had a reasonable opportunity to conduct discovery, so as to withstand a directed verdict motion. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir. 1989). As that Court stated, "the movant could challenge the opposing party to 'put up or shut up' on a critical issue...[and] if the respondent did not 'put up', summary judgment [is] proper." *Id.* at 1478.

## III. ANALYSIS

### A. Breach of Contract

It is readily apparent that the only way Rock City may be liable for breach is if there was in fact a contract that bound it to the RWE. Valid offer and acceptance are necessary elements to contract formation, and an offer alone imposes no obligation on the offeree, absent an acceptance by the party to whom it is made,

7

and not then unless the acceptance closes a contract. *See Anders v. Georgetown College, Inc.*, 286 S.W.2d 78, 79 (Ky. App. 1955); *Citizens' Nat. Life Ins. Co. v. Murphy*, 156 S.W. 1069, 1070 (Ky. App. 1913). It is well settled that mere silence does not constitute acceptance unless expressly so agreed. *Anders*, 286 S.W.2d at 79. By the same token, the offeror is entitled to know in clear and positive terms whether his offer has been accepted. Acts or words which may imply a probable acceptance are insufficient to create a binding obligation. *Venters v. Stewart*, 261 S.W.2d 444, 446 (Ky. App. 1953). Finally, the use of a subcontractor's bid in the bid package of a general contractor to the owner is not an acceptance to create a contractual relationship. *Finney Co., Inc. v. Monarch Construction Co., Inc.*, 670 S.W.2d 857, 859 (Ky. 1984).[1]

It is undisputed that there was no written acceptance or any other written evidence of a contract in this case. There was likewise no evidence of the Rock City bid containing any restrictions on the manner of acceptance. "Unless otherwise indicated by the language or the circumstances, an offer invites acceptance in any manner and by any medium reasonable in the circumstances."

---

[1]Plaintiff cites *Harry Harris, Inc., v. Quality Construction Co. Of Benton, Ky, Inc.*, 593 S.W.2d 872(Ky. App. 1979), for the opposite proposition. Any apparent conflict between the two cases was resolved by the Kentucky Court in *Lichtefeld-Massaro, Inc. v. R.J. Manteuffel Co., Inc.*, 806 S.W.2d 42, 44 (Ky. App. 1991). *Harry Harris* will be discussed under the heading "Promissory Estoppel."

8

Rest. 2d. Contracts § 30(2). Comment b to Restatement Section 65 lists the following among circumstance s relevant to reasonableness, "the speed and reliability of the medium, a prior course of dealing... and a usage of trade." Neither party has submitted evidence of a prior course of dealing between the two parties or of a particular usage of trade.[2] In addition, Section 52 of the Restatement provides that "An offer can be accepted only by a person whom it invites to furnish the consideration," and comment c provides that the rules of agency may supplement this principle.

Without a doubt, it is the Plaintiff's burden to carry to prove that the offer was accepted and there was indeed a contract. It is undisputed that the two individuals charged with the authority and responsibility for obtaining subcontracts, Walter Bannon and Caleb Moyer, did not communicate to Rock City an acceptance of its bid. The evidence offered by Plaintiff as constituting acceptance consists of the alleged statements of two individuals who arguably did not have the authority to bind RWE in a contract with Rock City.[3] That evidence is

---

[2] However, the Court does observe that the general contractor in this case, RBCC, accepted bids from both RWE and Rock City (for the outside work) via a writing.

[3] While the Plaintiff actually lists several pieces of evidence, including other actions by other parties, most are merely indicia of the Plaintiff's own state of mind. Whether RWE thought there was a contract is not relevant to this analysis. Likewise, the act of imploring performance under a contract that was never formed is irrelevant. Thus, the Court only focuses on those pieces of evidence that are relevant to the question of whether there was an objective manifestation of acceptance that operated legally to bind Rock City.

scant and vague at best.

John Binder, former Director of Operations for RWE, states in his affidavit that he "personally recall[s] advising RCM that they would be doing the Chase Outfitting for RWE." Binder does not state a specific individual that he advised, nor does he state when, precisely, this conversation took place. The Court observes that Binder was not deposed, and thus was not cross-examined on this particular statement. Binder next states that he spoke with Medlen and Mullins "on several occasions" to implore them to submit the designs for the work (ie, to begin performance). There is nothing in this affidavit that suggests a "clear and unequivocal" acceptance. There is likewise no evidence that Rock City should have looked to Binder for an acceptance rather than the two individuals responsible for the subcontract on this Project–Bannon or Moyer.

John Malonski, in his deposition, claims to have told "either or both" Medlen or Mullins that "you guys are going to be doing the work for us." Neither Medlen nor Mullins recall this conversation. Malonski's title was "Preconstruction Director." There is no indication that he had any authority whatsoever with regard to subcontracts.

In addition, RWE's undertaking to do its own design cuts against the existence of a contract. There is no evidence in the record that before setting about

10

to do this work, RWE advised Rock City (in writing or otherwise) that RWE would look to Rock City for damages for breach of contract. RWE's self-design looks more like evidence of a rejection of the bid proposal.

The sum total of the evidence is that the Plaintiff has failed to meet its burden. There is insufficient evidence on which a jury might find the bid was accepted and that Rock City had a contractual obligation. Defendant's Motion for Summary Judgment on this issue is therefore well taken and will be sustained.

### B. Promissory Estoppel

The doctrine of promissory estoppel, as adopted by Kentucky Courts, is as follows:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires. Rest. 2d Contr. §90.

Plaintiff relies on *Meade Construction Co., Inc. v. Mansfield Comm. Elec., Inc.*, 579 S.W.2d 105 (Ky. 1979) for the proposition that the incorporation of a subcontractor's bid in the general contractor's bid to the owner constitutes detrimental reliance thereon and binds the subcontractor to honor its bid. However, *Meade* and its progeny, *Harry Harris, Inc., v. Quality Construction Co. Of Benton,*

11

*Inc.,* 593 S.W.2d 872 (Ky. App. 1979), both contain elements missing from the facts of this case. Accordingly, they do not compel the finding Plaintiff urges.

Most importantly, in each case there was an unequivocal communication of acceptance to the subcontractor, soon after the awarding of the contract to the general. Both cases involved a timely request to enter into a formal contract. That fact is conspicuously absent from the case at bar. While RWE did eventually send a proposed subcontract for Rock City to sign, this did not occur until July 2002. Rock City's bid was submitted in August 2001. RWE was awarded the contract with RBCC in October 2001. Moreover, RWE submitted the proposed subcontract based on Rock City's original bid after RWE had undertaken performance on its own and changed the design on which the original bid was premised. Promissory estoppel acts to prevent a subcontractor from withdrawing its bid before the general contractor has a chance to accept. It does not act to hold a subcontractor indefinitely bound while the general contractor (or in this case, other subcontractor) tarries for no apparent reason. The Plaintiff fails to carry his burden on this issue as well.

## IV. CONCLUSION

For the reasons stated above, the Court will sustain the Motion for Summary

Judgment and dismiss the Complaint. Accordingly, **IT IS HEREBY ORDERED:**

1) that Defendant's Motion for Summary Judgment [Docket No. 21] is **SUSTAINED;**

2) that Plaintiff's Complaint is **DISMISSED WITH PREJUDICE;**

3) that a separate judgment consistent with this opinion shall issue this day.

This April 11, 2006.



Signed By:
**Henry R Wilhoit Jr.**
**United States District Judge**